1   MICHAEL BAILEY
    United States Attorney
2   District of Arizona
    MICHAEL A. AMBRI
3   Assistant U.S. Attorney
    State Bar No. 021653
4   United States Courthouse
    405 W. Congress Street, Suite 4800
5   Tucson, Arizona 85701
    Telephone:  520-620-7449
6   Email: michael.ambri@usdoj.gov
    Attorneys for Defendant United States of America
7

8              IN THE UNITED STATES DISTRICT COURT

9                 FOR THE DISTRICT OF ARIZONA

10  |                                    |  **4:17-CV-00427-DCB**
    | Edward J. Gladney,                 |
11  |                                    |  **MOTION TO DISMISS FOR LACK**
    |              Plaintiff,             |  **OF SUBJECT MATTER JURISDICTION**
12  |                                    |  **AND, IN THE ALTERNATIVE, MOTION**
    |        vs.                         |  **FOR SUMMARY JUDGMENT /**
13  |                                    |  **RESPONSE TO PLAINTIFF'S MOTION**
    | United States of America,          |  **FOR SUMMARY JUDGMENT**
14  |                                    |
    |              Defendant.            |
15

16          Defendant hereby moves for dismissal of this action for lack of subject matter

17  jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), on the basis that Plaintiff's claims are

18  barred under the Federal Tort Claims Act's ("FTCA's") discretionary function exception,

19  28 U.S.C. § 2680(a).   Defendant also moves for dismissal for lack of subject matter

20  jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) on any and all claims beyond the alleged

21  claim of failure to monitor by the officer on duty in Plaintiff's housing unit, on the basis that

22  Plaintiff failed to exhaust his administrative remedies.   Defendant alternatively moves for

23  summary judgment on Plaintiff's complaint (Doc. 10) pursuant to Fed. R. Civ. P. 56, on

24  the following grounds:  (1) Plaintiff's claims are barred for lack of physical harm or "sexual

25  act" pursuant to the Prison Litigation Reform Act, 42 U.S.C.A. § 1997e, (2) Plaintiff's

26  claims are time-barred under the applicable statute of limitations, 28 U.S.C. § 2401(b),

27  and (3) Plaintiff does not and cannot establish two elements on which she has the burden

28  of proof, breach of duty and causation.   Defendant also responds to Plaintiff's Motion for

Summary Judgment (Docs. 76, 79).  Filed concurrently herewith is Defendant's Statement of Facts ("DSOF"), which sets forth the facts relevant to this motion, and Defendant's Response to Plaintiff's Statement of Facts (Doc. 77).  Defendant requests that this action be dismissed with prejudice and, alternatively, that Plaintiff's motion for summary judgment be denied and that summary judgment be entered in Defendant's favor.[1]

## I.   FACTUAL BACKGROUND.

This is an action by a *pro se* federal prisoner under the FTCA, 28 U.S.C. §§ 2671-80.  Plaintiff is serving a 60-year sentence for Production of Child Pornography (18 U.S.C. §§ 2251(A)&(E) and Advertising of Child Pornography (18 U.S.C. §§ 2251 (D)(1)(A)&(E)).  (SOF 51.)  This case relates to events at the United States Penitentiary in Tucson, Arizona ("USP Tucson").

According to Plaintiff, soon after 9:00 a.m. on May 19, 2016, an inmate approached Plaintiff in the common area of Plaintiff's housing unit, B-2 Unit, and asked Plaintiff to accompany him to the cell of another inmate, which Plaintiff did.  (SOF 52.)  Inside the cell, according to Plaintiff, the inmate pulled Plaintiff's pants and underwear down and self-masturbated.  (SOF 53, 57.)

On October 24, 2016, Plaintiff filed an administrative tort claim with the Bureau of Prisons ("BOP").  (SOF 54.)  His claim to the agency was that "[t]he officer posted in my unit (B-2), Correctional Officer Westling, willfully [sic] or otherwise negligently failed to monitor inmates who did not belong in the unit (B-2)."  (*Id.*)  BOP investigated Plaintiff's claim and, on March 10, 2017, denied the claim in writing.  (*Id.*)

On August 28, 2017, Plaintiff filed a civil rights action in this Court against a number of BOP employees and the Bureau of Prisons pursuant to *Bivens v. Six Unknown Named Agents,* 403 U.S. 388 (1971).  (Doc. 1 at pp. 3-4.)  On screening under 28 U.S.C. § 1915A(a), the Court found that the Complaint failed to allege facts sufficient to state a claim with respect to the *Bivens* claims.  (Doc. 7 at 4-5.)  The Court dismissed the action

---

[1]  In keeping with Plaintiff's preference, this motion uses feminine pronouns for Plaintiff.

1    without prejudice with leave to amend.  (*Id.*)  On November 17, 2017, Plaintiff filed a First

2    Amended Complaint alleging an FTCA claim against the United States.  (Doc. 9.)  A

3    duplicate First Amended Complaint was filed into the Court's record on November 20,

4    2017, at Document No. 10.[2]

5         The Second Amended Complaint claims BOP "failed to provide adequate officer

6    monitoring of an out-of-bounds inmate and failed to adequately staff housing unit with at

7    least two officers as required."  (Doc. 10, at p. 3.)  As confirmed by Plaintiff in her

8    deposition, Plaintiff claims that the alleged failure to monitor and have two officers on duty

9    enabled the inmate to enter Plaintiff's housing unit where she alleges the incident

10   occurred.  (SOF 55.)  Plaintiff acknowledged at the time of the alleged incident and in her

11   deposition that she did not suffer any physical injury.  (SOF 56.)  She does not seek any

12   relief related to bodily harm.  (*Id.*)  She alleges only mental or emotional harm.  (*Id.*)

13        Plaintiff's motion for summary judgment (Doc. 79) argues that BOP violated

14   18 U.S.C. § 4042 (duties of the Bureau of Prisons), 28 C.F.R. § 115.13 (supervision and

15   monitoring), 28 C.F.R. § 115.11 (zero tolerance of sexual abuse and sexual harassment),

16   28 C.F.R. § 115.87 (data collection), BOP Program Statement 3420.11(6) (standards of

17   employee conduct: responsiveness), and BOP Program Statement 1210.24(7)(b)

18   (classification of offenses in connection with reporting staff misconduct).  Plaintiff's motion

19   suggests BOP failed to protect him in that "Plaintiff appeared transgender/feminine in

20   manner and appearance. … BOP possessed information which identified the Plaintiff as

21   being homosexual … [and] United States Penitentiary Tucson was a facility with a 'Sex

22   Offender Management Program' which housed several high-security Sex Offenders."

23   (Doc. 79 at p. 3.)  She alleges BOP had inadequate video monitoring of his unit, in that

24   there is no footage showing how her alleged assailant entered B-2 Unit or how many

25   officers were on duty in the unit.  (*Id.* at 5.)  Last, she argues her unit was understaffed

26   with one officer on duty in instead of two, because she had observed that the unit on other

27   _____

28   [2]  The Court's docket refers to Document No. 10 as a Second Amended Complaint.  This
     motion refers to Doc. 10, the last-filed complaint, as the Second Amended Complaint.

1   occasions had two officers on duty.  (*Id.* at 5-6.)

2   The day after the alleged incident, Plaintiff submitted a written note to her

3   counselor.  (SOF 5, 57.)   Upon being notified, BOP provided Plaintiff with a medical

4   evaluation and psychological consultation, and conducted an investigation.  (SOF 5.)  The

5   investigation included interviews of Plaintiff, the alleged assailant, and three other

6   inmates.  (*Id.*)  No one except Plaintiff confirmed the incident.  (SOF 6.)  The alleged

7   assailant admits being out-of-bounds in Plaintiff's housing unit but denies the events

8   Plaintiff described.  (SOF 9.)  He claims to have been in the housing unit to obtain stamps

9   from another inmate and that he was in that inmate's cell waiting for the inmate to return.

10  (*Id.*)  He admits he talked to Plaintiff but denies assaulting him in any way.  (*Id.*)  BOP

11  also reviewed video of the unit but none showed what happened inside the cell where

12  Plaintiff alleges the incident occurred.  (SOF 10.)

13  BOP determined the incident was unsubstantiated.  (SOF 11.) The alleged

14  assailant was disciplined for being out of bounds, a violation of BOP Code 316 (being in

15  an unauthorized area).  (SOF 12.)  Due to remarks by Plaintiff suggesting Plaintiff might

16  harm the alleged assailant, that inmate was transferred out of USP Tucson. (SOF 13.)

17  In his note to staff, Plaintiff described what happened:  "He forced by shorts down

18  and began masturbating."  (SOF 57.)  Plaintiff was then interviewed by a BOP

19  investigator, a medical provider and a psychologist.  (SOF 5, 58)  According to Plaintiff,

20  she told those officials all the facts related to the incident.  (SOF 58.)  Plaintiff's statement

21  to the investigator was that the alleged assailant pulled down Plaintiff's pants and

22  masturbated while looking at Plaintiff and that the assailant did not touch her in a sexual

23  manner.  (*Id.*)   Plaintiff confirmed to the medical staff that the inmate pulled down

24  Plaintiff's pants and masturbated, that no penetration occurred, that no force was used,

25  and that Plaintiff suffered no injuries.  (*Id.*)  She told the BOP psychologist that the

26  assailant pulled down her pants but did not touch her any further.  (*Id.*)

27  Staffing at Bureau of Prisons facilities is based on the security level of the

28  institution, the unique mission and layout of the institution, and BOP's allocation of

financial and human resources across the 122 prisons it operates.  (SOF 30.)  The Complex Captain is responsible for establishing the correctional officer roster at USP Tucson, after consultation with and approval by the Warden.  (*Id.*)

From 2013 to 2016, the BOP staffing allocation for housing unit officers at high security facilities provided for one officer on each unit, during each of the three shifts.  (SOF 31.)  At USP Tucson, the three shifts were the Morning Watch (12:00 a.m. to 8:00 a.m.), Day Watch (8:00 a.m. to 4:00 p.m.), and Evening Watch (4:00 p.m. to 8 a.m.).  (*Id.*)  The staffing allocation also authorized a second unit officer in each unit during the evening hours.  (*Id.*)  As shown in the 2016 Staffing Guidelines, USP Tucson established a second unit officer post in each unit from 2:15 p.m. to 10:15 p.m.  (*Id.*)

The BOP Fiscal Year 2016 budget sought increased funding to provide for a second correctional officer in each unit, on each shift, at High-Security institutions, like USP Tucson.  (SOF 32.)  This request was primarily designed to increase officer safety in the housing units.  (*Id.*)  Once the budget increase was approved by Congress, BOP updated its staffing guidelines to provide for two unit officers on each shift at all High-Security institutions.  (*Id.*)

Under the Master Agreement between BOP and the Council of Prison Locals, quarterly rosters must be posted prior to the upcoming quarter, so bargaining unit staff can bid for assignments and shifts and submit requests for leave.  (SOF 33.)  In order to comply with the Master Agreement, the additional post created by the updated staffing guidelines had to be added to the roster and posted for the bargaining unit staff bidding process.  (*Id.*)  As a result, the updated staffing guidelines became effective at USP Tucson at the 2nd quarter change, on June 15, 2016.  (*Id.*)

Inmate accountability procedures within BOP and FCC Tucson balance security needs, available resources, and the need for inmates to be able to circulate within the institution.  (SOF 34.)  Though the procedures help minimize risks and are effective, they are not perfect.  (*Id.*)  The inmate accountability procedures do not enable all staff to know where each inmate is within the facility at every moment of the day.  (SOF 35.)  The

procedures provide a way for staff at various locations through FCC Tucson to identify the inmates in their areas at certain points throughout the day and, at specified periods, to conduct an official count of the inmates in the institution. (*Id.*) Staff cannot know, and do not know, the location of an inmate at all times during the day. (*Id.*) Instead, at certain moments, staff make official or unofficial checks for inmates but, between those moments, inmates have multiple opportunities to move without immediate detection. (*Id.*) As outlined in Program Statement 5500.14, Ch. 3, the accountability procedures include (1) official counts, (2) emergency counts, (3) census checks, (4) inmate callouts, (5) pass system (if utilized), (6) detail crew kits and (7) inmate movements. (*Id.*)

BOP institutions conduct five official counts during a 24-hour period. (SOF 36.) On May 19, 2016 at USP Tucson, these counts occurred at or around 12:01 a.m, 3:00 a.m., 5:00 a.m., 10:00 a.m., 4:00 p.m., and 10:00 p.m. (*Id.*) During a count, all inmates are locked in their cells, and two staff members check each cell to determine that the assigned inmates are present and alive. (*Id.*) If an inmate is unable to be in his or her cell due to a work assignment, hospital trip or some other permissible reason, that inmate is included in an "out count." (*Id.*) The results of the count are reported to the facility control center, where the number is checked against the official institution census. (*Id.*) Inmates remain in their cells until the count is cleared. (*Id.*) Emergency counts follow the same procedures as an official count, but are called at times other than the official count, when circumstances so require. (*Id.*)

Census checks are not official counts but are conducted by Unit Officers, Departments, and Work Detail Supervisors to identify inmates who are in unauthorized or unassigned areas. (SOF 37.) During a census check, the Unit Officer or detail officer checks the inmates in the unit, department, or work detail against the roster for that particular area, and identifies any inmates who are missing without leave or who are present but not authorized. (*Id.*) At the time relevant to this case (morning in a housing unit) the USP Tucson census checks were to occur after the 7:50 a.m. work call and before the 9:00 a.m. open move. (*Id.*) On May 19, 2016, the morning census of the B-2

Unit was conducted at 8:40 a.m. and showed no unauthorized inmates present, and no inmates absent without leave. (*Id.*) Additional census checks are conducted in other areas of a prison. (*Id.*) For example, lieutenants conduct monthly checks of the work details by checking 25 percent of the work details each week. (*Id.*) Institutions also conduct a monthly "lockdown accountability check" or "lockdown census" at random times each month. (*Id.*) Inmate callout sheets are used for staff members or departments to request the presence of an inmate in a particular area of the prison that is not the inmate's ordinary, assigned location (e.g., for a medical appointment, educational testing, etc). (SOF 38.) If an inmate does not arrive at the specified location at the appropriate time, staff initiate efforts to locate the inmate. (*Id.*) The pass system permits some inmate workers (ordinarily facilities workers) to go to certain areas without direct supervision. (SOF 39.) All inmate workers at USP Tucson must be under staff supervision, so USP Tucson does not utilize a pass system. (*Id.*) Each work detail has a Crew Kit, which is an electronically generated roster identifying information of each inmate on the work detail. (SOF 40.) The kits are created daily, and the detail supervisor is to audit the crew kit for accuracy at the beginning of each shift. (*Id.*) Inmates who do not have a work assignment will be included in the Unit's detail kit. (*Id.*)

During normal business hours, the compound officer controls inmate movement between areas in the prison. (SOF 41.) During controlled movements, at least one staff member is to stand post at the entrance door to monitor inmate movement, conduct pat searches, and utilize the metal detectors. (*Id.*) Staff are to challenge inmate movement that occurs outside a controlled move time. (*Id.*) As relevant to this case, on weekdays, there was a 10-minute open move at 9:00 a.m., which was an opportunity for all inmates to move freely around the prison during the move period. (*Id.*)

USP Tucson Housing Units have surveillance cameras to assist staff in monitoring the activities of inmates in the unit. (SOF ¶ 42.) The camera footage can be monitored in real time by staff in the control room and the Special Investigative Services department. (*Id.*) Footage is retained for 21 days, so it can be reviewed for investigative purposes.

(*Id.*)  The surveillance cameras cover the majority of the common area of the unit, but they do not capture activity inside of the cells.  (SOF 43.)  Each cell in USP Tucson's B-2 Unit has a solid metal door with a small window measuring approximately 7 1/2 inches by 22 1/4 inches.  (*Id.*)  When the door is closed, any view to the inside of the cell is obstructed, except by someone peering through the window.  (*Id.*)  Correctional officers look through the cell door windows when doing rounds, census checks or counts, none of which were conducted or required to be conducted in B-2 Unit between 9:00 a.m. and 10:06 a.m. on May 19, 2016.  (*Id.*)

Despite the inmate accountability procedures, inmates can and sometimes do engage in misconduct that evades detection.  (SOF 44.)  The inmate discipline program creates procedures for BOP staff to impose sanctions on inmates who commit prohibited acts.  (*Id.*)  When inmates venture out of bounds, they violate Prohibited Act Code 316, Being in an unauthorized area.  (*Id.*)  Inmates commit this prohibited act for any number of reasons, most of which have nothing to do with an assault.  (*Id.*)  Prohibited Act Code 316 is intended to deter inmates from being in areas where they could plan or effect an escape, obtain or hide contraband, or engage in other activities that could threaten the secure and orderly operation of the institution and the protection of the public.  (*Id.*)  Other Prohibited Acts, such as Code 101, Assaulting any person; Code 114, Sexual assault; and Code 201, Fighting with another person, are specifically designed to deter assaults on inmates.  (*Id.*)

On May 19, 2016 – the date of the alleged assault – there was one correctional officer assigned to the B-2 Unit during the day shift.  (SOF 45.)  This staffing level was based on the resources allocated for USP Tucson and was consistent with the secure and orderly operation of the institution and the unit.  (*Id.*)  The staffing level did not violate a mandate to have two officers on duty, because there was no such mandate.  (*Id.*)  Unit staffing was increased to two officers per unit per shift the following quarter.  (*Id.*)

On May 19, 2016, there was no requirement for staff to check the identification of every inmate who entered a unit.  (SOF 46.)  At that time, inmates entering a housing

unit at USP Tucson – including B-2 Unit – passed through a metal detector within a sallyport before emerging into the unit. (*Id.*)   It was not required for officers to check every inmate's ID card before allowing the inmate to enter a housing unit during an open move. (*Id.*)   In fact, due to the high volume of inmate movement during open moves, it was not possible for staff to verify the identity of each inmate. (*Id.*)  Instead, a unit officer posts near the entrance where he or she can monitor inmate behavior, conduct random searches and use the metal detectors.   (*Id.*)

In this case, the alleged assailant entered B-2 Unit just after 9:00 a.m. on May 19, 2016, which was during an open move directly after the B-2 census was completed. (SOF 47.)  He could have done so without violating any inmate accountability requirements. (*Id.*)  He used an opportunity during an open move, between two scheduled accountability checks, to enter the unit. (*Id.*)  During the 9:00 a.m. move, there was a correctional officer posted at the entrance to B-2 Unit.  (SOF 47, 69.)

Similarly, despite being assigned to different housing units at USP Tucson, inmate Gladney and the alleged assailant would have had many other opportunities to come in contact with one another even if the other inmate had not entered inmate Gladney's housing unit on May 19, 2016. (SOF 48.)  Inmates from different housing units come into contact in the recreation yard, at work assignments, during meal times, during sick call, and in pill line. (*Id.*)

Even if there were a requirement to have two officers on duty during the Day Watch on May 19, 2016, the presence of a second officer on the unit would not have prevented the inmate from entering B-2 Unit. (SOF 49.)  The procedure is as described above, with one officer posted at the entrance monitoring the ingress and egress during open moves, as occurred here, but without the requirement or practicable ability to challenge the entry or check the identification of each and every inmate. (*Id.*)

There was no indication prior to the alleged incident that inmate Gladney was at risk of harm from the inmate he alleges assaulted him or from any other inmate. (SOF 50.)  Inmate Gladney was properly designated to USP Tucson, based on his criminal

1    history and background, and he had never made any complaints to staff about the inmate.

2    (*Id;* SOF 63.)    Prior to the alleged assault, there was no assignment of separation

3    prohibiting the two inmates from having contact. (*Id.*)

4    **II.    THE COURT LACKS SUBJECT MATTER JURISDICTION.**

5          **A.    The FTCA's Limited Jurisdictional Grant.**

6          It is presumed that a claim lies outside the Court's limited jurisdiction; it is the

7    burden of the party asserting jurisdiction to establish it.  *Kokkonen v. Guardian Life Ins.*

8    *Co.,* 511 U.S. 375, 377 (1994); *Ashoff v. Ukiah,* 130 F.3d 409, 410 (9th Cir. 1997).   In

9    making the determination, the Court may consider evidence outside the pleadings without

10   converting the Rule 12(b)(1) motion to one for summary judgment, and may resolve

11   factual disputes.   *McCarthy v. U.S.,* 850 F.2d 558, 560 (9th Cir. 1988).   "If the court

12   determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the

13   action."  Fed. R. Civ. P. 12(h)(3); *Makay v. Pfeil*, 827 F.2d 540, 543 (9th Cir. 1987).

14         The United States, as a sovereign entity, is immune from suit except insofar as it

15   has consented to be sued.  *Lehman v. Nakshian,* 453 U.S. 156, 160-61 (1981) (quoting

16   *United States v. Testan*, 424 U.S. 392, 399 (1976)).   The terms of the government's

17   consent define the court's jurisdiction.   *Id.*   The FTCA is a limited waiver of sovereign

18   immunity.  *U.S. v. Orleans,* 425 U.S. 807, 813 (1976).  Subject to a number of limitations,

19   conditions and exclusions, the FTCA allows the government to be held liable for money

20   damages for personal injury, property damage or death "where the United States, if a

21   private person, would be liable to the claimant in accordance with the law of the place

22   where the act or omission occurred."  28 U.S.C. § 1346(b); *U.S. v. Muniz,* 374 U.S. 150,

23   153 (1963); *Brandes v. U.S.,* 783 F.2d 895, 896 (9th Cir. 1986).

24         Under the FTCA, "[a]n action shall not be instituted upon a claim against the United

25   States … unless the claimant shall have first presented the claim to the appropriate

26   Federal agency and his claim shall have been finally decided by the agency in writing. …"

27   28 U.S.C. § 2675(a).  The administrative exhaustion requirement is to promote agency

28   resolution of claims, provide a well-developed record in the event of litigation, and ease

the burden of the courts. *Brady v. United States,* 211 F.3d 499, 503 (9th Cir. 2000). "Because the requirement is jurisdictional, 'it must be strictly adhered to.'" *Id.* at 502 (quoting *Jerves v. United States,* 966 F.2d 517, 521 (9th Cir. 1992)); *see also McNeil v. United States,* 508 U.S. 106, 113 (1993). The administrative claim must provide notice to the agency of all grounds for relief and enable the agency to make an informed evaluation of the claim. *Blair v. I.R.S.,* 304 F.3d 861, 865 (9th Cir. 2002). Any claims not included in the administrative complaint must be dismissed for lack of subject matter jurisdiction. *Brady,* 211 F.3d at 503; *Jerves,* 966 F.2d at 519. This is so even if other claims arising from the alleged conduct were presented to the agency and are allowed to proceed in the court action. *Blair,* 304 F.3d at 866.

Under the discretionary function exception, 28 U.S.C. § 2680(a), the FTCA's waiver of sovereign immunity and its related jurisdictional grant under 28 U.S.C. § 1346(b) do not apply to "[a]ny claim … based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the federal agency or an employee of the Government, whether or not the discretion involved be abused." *Doe v. Holy See,* 557 F.3d 1066, 1084-85 (9th Cir. 2009). The exception is intended to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 814 (1984). "Where there is room for policy judgment and decision there is discretion." *Dalehite v. United States*, 346 U.S. 15, 36 (1953). Where the exception applies, the United States has not waived its sovereign immunity and the court lacks subject matter jurisdiction over the claims. *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1173 (9th Cir. 2002).

## B.     Plaintiff Failed To Exhaust Most of The Claims.

Plaintiff has failed to exhaust her administrative remedies with respect any and all claims other than a failure to monitor by the officer on duty, including the allegation that Plaintiff's unit was improperly staffed and the allegations, raised for the first time in Plaintiff's motion for summary judgment, that USP Tucson somehow ran afoul of the

Prison Rape Elimination Act, lack of video monitoring, and that Plaintiff was improperly placed in the Sex Offenders Management Program.   The sole claim in Plaintiff's administrative complaint is that "[t]he officer posted in my unit (B-2), Correctional Officer Westling, willfully [sic] or otherwise negligently failed to monitor inmates who did not belong in the unit (B-2).  (SOF 59.).  Based on Plaintiff's complaint, BOP considered and denied solely this claim, not any of the other claims Plaintiff now attempts to assert in this action.  (SOF 60.)  Thus, any claims beyond the officer's negligence in allowing an out of bounds inmate to B-2 Unit has not been administratively exhausted, and the Court lacks subject matter jurisdiction over those claims.  *See, e.g., Blair,* 304 F.3d at 866.

### C.     The Claims Are Barred Under The Discretionary Function Exception.

Courts "use a two-step analysis to determine whether conduct falls under the discretionary function exception."  *Sabow v. U.S.,* 93 U.S. 1445, 1451 (9th Cir. 1996).  The first step is to consider "whether the challenged actions involve 'an element of judgment or choice.'"  *Id.* (quoting *U.S. v. Gaubert,* 499 U.S. 315 (1991)).  This requirement – the "discretionary act" requirement – is met unless "'a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.'"  *Id.* (quoting *Berkovitz v. U.S.,* 486 U.S. 531, 536 (1988)).  If the challenged actions are discretionary, courts proceed to the second step of the analysis, whether the federal employee's "judgment involves considerations of social, economic, or political policy."  *Id.*  The focus of the second step is "not on the agent's subjective intent in exercising the discretion conferred by statute or regulation," but rather "on the nature of the actions taken and on whether they are susceptible to policy analysis."  *Gonzalez,* 814 F.3d at 1027-28 (citing *United States v. Gaubert,* 499 U.S. 315, 325 (1991).  "The decision need not actually be grounded in policy considerations so long as it is, by its nature, susceptible to a policy analysis."  *Gonzalez,* 814 F.3d at 1028 (citing *GATX/Airlog Co.,* 286 F.3d at 1174 (internal quotation marks omitted)).   "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when

1    exercising that discretion." *Gaubert,* 499 U.S. at 324.  This step in the analysis is the

2    "policy judgment" prong.  *Gonzalez,* 814 F.3d at 1028 (citing *Sabow,* 93 F.3d at 1451)).

3         There is no statute, regulation or policy mandating specific measures applicable to

4    Plaintiff's claims.  With respect to monitoring, the applicable policy is BOP Program

5    Statement 5500.14 (Correctional Services Procedures Manual).  That policy requires only

6    that an institution conduct five official inmate counts during every 24-hour period (P.S.

7    5500.14, Ch. 3, Sec. 300) and unofficial census checks (*id.,* Sec. 304).  The policy leaves

8    it to officials to "set guidelines and procedures for conducting the census check." *Id.* At

9    USP Tucson, staff conduct census checks in the morning and afternoon, after the inmate

10   moves have secured.).  Program Statement 5500.14 does not limit the discretion of prison

11   officials when it comes to how to staff the prison, how to conduct census checks or how

12   to otherwise monitor prisoner movement.  Instead, the policy leaves it to the discretion of

13   BOP officials as to how to ensure inmate accountability.

14        Staffing is similarly discretionary.  Staffing is based on the security level of the

15   institution, the unique mission and layout of the institution, and on the BOP allocation of

16   financial and human resources.  At the time of Plaintiff's alleged incident, staffing

17   allocations for housing unit officers at high security facilities provided for one officer on

18   each unit, during each of the three shifts.  The staffing allocation also authorized a second

19   unit officer in each unit during the evening hours.  In the exercise of BOP's discretion,

20   BOP requested increased funding from Congress to provide for a second correctional

21   officer in each unit, on each shift, at high-security institutions, like USP Tucson.  Once the

22   budget increase was approved by Congress, BOP updated its staffing guidelines to

23   provide for two unit officers on each shift at all high-security institutions, which went into

24   effect a month after Plaintiff's alleged incident.[3]

25

26   [3]  References to a mandate in connection with the staffing guidelines provided with
     Defendant's Statement of Facts (Attach. I to Ex. 2) do not take away from BOP's
27   discretion with respect to staffing.  There is no staffing mandate from Congress.  The
     relevant act of Congress was a consolidated appropriations act, not a mandate
28   concerning staffing.  *See* Public Law 114-113 (Dec. 18, 2015), 129 Stat. 2243, available
     at   https://www.govinfo.gov/content/pkg/PLAW-114publ113/pdf/PLAW-114publ113.pdf.

The second prong of the discretionary function exception asks whether the nature of the actions taken "are susceptible to policy analysis." *Gonzalez,* 814 F.3d at 1027-28 (citing *United States v. Gaubert,* 499 U.S. 315, 325 (1991)).   Decisions about prison staffing and supervision are inherently policy-based.   Courts have long recognized that prison authorities "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 527 (1979); *Rhodes v. Chapman,* 452 U.S. 337, 349 n. 14 (1981) ("a prisons internal security is peculiarly a matter normally left to the discretion of prison administrators").

In *Alfrey v. United States,* 276 F.3d 557 (9th Cir. 2002), the Ninth Circuit considered whether to apply the discretionary function exception in an FTCA claim that included allegations that prison officials failed to respond to an inmate's complaint that his cell-mate threatened him, and failed to conduct an adequate search for the weapon the cell-mate ultimately used to murder the inmate.   *Alfrey,* 276 F.3d at 559.   The Ninth Circuit observed:  "A prison official's judgment about how extensively to search a cell involves a balancing of the potential risk, on the one hand, against the inmate's interest in being free from overly intrusive searches, on the other.   Similarly, to decide what steps to take in response to a reported threat, an officer must set priorities among all extant risks: the risk presented by the reported threat, along with the other risks that inevitably arise in a prison.   Those types of decisions implicate social and public-policy considerations." *Id.* at 565.

The *Alfrey* analysis applies to Plaintiff's claims.   Decisions about how many staff to assign to a unit and how to monitor inmates involve the same balancing of concerns discussed in *Alfrey.   See Alfrey,* 276 F.3d at 564-65 ("balancing the need to provide

---

The appropriations act nowhere dictates any two-officer requirement.   *See, especially, id.,* Title II, 129 Stat at 2296 (pertaining to DOJ appropriations).  It was BOP that requested the funding for an additional officer in exercising its discretion regarding staffing and that chose to implement the additional officer in June 2016 after the requisite union negotiations.   (SOF 33.)  As reported by the Senate committee, the additional funding was to help address "unsafe environments for correctional officers and other BOP staff." Senate Report 114-66, at p. 72, available at https://www.congress.gov/congressional-report/114th-congress/senate-report/66.

inmate security with the rights of inmates to circulate and socialize within the prison involves considerations based upon public policy"); *Doe,* 2014 WL 7272853 *12 (facility's decision to leave staff member alone with an inmate who alleged the staff member sexually abused her, in unmonitored areas of the facility, is susceptible to a policy analysis) (citing *Dykstra v. U.S. Bureau of Prisons,* 140 F.3d 791, 796 (8th Cir. 1998) ("Prison officials supervise inmates based upon security levels, available resources, classification of inmates, and other factors … inherently grounded in social, political and economic policy.")); *Santana-Rosa v. United States,* 335 F.3d 39 (1st Cir. 2003) (discretionary function exception barred prisoner's claim that prison negligently allowed access to the tool that a fellow prisoner used to assault him); *Knappick v. United States,* 875 F.2d 318 (9th Cir. 1989) (discretionary function exception barred negligent staffing claim arising from officer's rape of inmate); *Caudle v. United States,* 72 F.3d 132 (7th Cir. 1995) (assignment and supervision for protection of prisoners are policy-based, including the appropriate allocation of resources and effective provision of prison security); *Miller v. United States,* 992 F.2d 1223 (10th Cir. 1993) (barring claim that officials had advance warning of riot and should have searched for weapons).

In response to the claims suggested in Plaintiff's motion for summary judgment, a review of the BOP program statements and other materials Plaintiff cites shows that none of the materials eliminates discretion on the part of prison officials with respect to monitoring, staffing, determination of an inmate's placement within BOP, or how to protect inmates.  Each of these functions is inherently discretionary and policy-based, and is protected under the discretionary function exception.  *See Sarafin v. United States,* No. CV14-2777, 2015WL6125430, *3-5 (C.D. Cal. Aug. 21, 2015) (collecting cases and finding that courts "have uniformly held that [claims for injuries from fellow inmates] are barred by the discretionary function exception"); *Mitchell v. United States,* 149 F.Supp.2d 1111 (D. Ariz. 1999) (failure-to-protect claim barred by discretionary function exception); *Cohen v. United States,* 151 F.3d 1338 (11th Cir. 1998) (barring claim that plaintiff's attacker was negligently assigned to minimum security prison); *Barrett v. United States,*

845 F. Supp. 774 (D. Kan. 1994) (barring claim in inmate stabbing of failure to put inmate in protective custody after death threat); *Bishop v. U.S.,* 2017 WL 1381653 (D. Hawaii April 13, 2017) (barring inmate-placement claim); *Dykstra v. BOP,* 140 F.3d 791 (8th Cir. 1998) (barring claim of failure to place youthful-looking inmate in protective custody).[4]

The nature of the conduct challenged by Plaintiff involves judgment and choice on the part of prison officials, and those judgments and choices are susceptible to policy considerations.   Plaintiff's claims are barred by the FTCA's discretionary function exception and the Court lacks jurisdiction over the claims.   However, as set forth below, in the event the action is not dismissed under Fed. R. Civ. P. 12(b)(1), Defendant is entitled to summary judgment for a number of independent reasons.

## III.   DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT.

### A.   Summary Judgment Standard.

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party to identify specific genuine issues of material fact that must be decided at trial.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986).  A fact is "material" only if it affects the outcome of the suit under the law governing the claim.  *Id.* at 248.  A dispute of fact is "genuine" only if the evidence is such that a reasonable fact-finder could find for the nonmoving party.  *Id.*  To avoid summary judgment, the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  The nonmoving party must set forth specific facts.  Fed. R. Civ. P. 56(c); *Matsushita,* 475 U.S. at 586.  Evidence that is conclusory, speculative or

---

[4] Further demonstrating the discretion and policy involved in inmate-placement decisions, and further barring any claim relating to Plaintiff's placement, Congress has provided that BOP's inmate placement decisions are not subject to review.  *See* 18 U.S.C. § 3621(b).

not significantly probative is insufficient to avoid summary judgment.  *Anderson,* 477 U.S. at 249; *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007).

### B.   Plaintiff's Claim Is Barred Under The PLRA.

Under the Prison Litigation Reform Act ("PLRA"), "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18)."  42 U.S.C. § 1997e; *Oliver v. Keller,* 289 F.3d 623, 629 (9th Cir. 2002) (affirming summary judgment under 42 U.S.C.A. § 1997e and finding that the PLRA requires more than *de minimis* physical injury).  The term "sexual act" is defined as (a) contact between the penis and the vulva or the penis and the anus; (b) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus; (c) penetration of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or (d) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.  18 U.S.C.A. § 2246.  Plaintiff's claim involves neither physical harm nor a "sexual act" as defined in the PLRA.   As Plaintiff has confirmed multiple times, (a) the full extent of what transpired was that the inmate pulled down Plaintiff's pants and underwear and masturbated himself, without touching Plaintiff and (b) Plaintiff suffered no physical harm.   (SOF 56, 57, 58.)  Accordingly, Plaintiff's claims are barred under 42 U.S.C. § 1997e.

### C.   Plaintiff's Claims Are Barred By The Statute Of Limitations.

An FTCA claim "shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues" and then filed in federal court "within six months" after the agency mails its decision on the claim.  28 U.S.C. § 2401(b); *United States v. Kubrick,* 444 U.S. 111, 117 (1979) (the statute's emphatic language indicates Congress's intent to "encourage the prompt presentation of

- 17 -

claims" for money damages to be paid out of the federal Treasury").  The FCTA's statute of limitations is "a 'meritorious defense, in itself serving a public interest.'" *Kubrick,* 444 U.S. at 117; *see also McNeil v. United States,* 508 U.S. 106, 113 (1993).

The government denied Plaintiff's administrative tort claim on March 10, 2017, making the due date for Plaintiff's claim against the government September 10, 2017. Instead of filing a tort action against the government, on August 28, 2017, Plaintiff filed a civil rights action against a number of BOP employees in their individual capacities and the Bureau of Prisons.  *See* Doc. 1 at pp. 3-4.  *See* Doc. 1.  After the Court dismissed that action, Plaintiff filed his FTCA claim against the United States on November 10, 2017, two months after expiration of the FTCA limitations period.  *See* Doc. 9.  No defendant named in the original Complaint was ever served with the original Complaint.  The United States was served for the first time on March 15, 2018 (*see* Docs. 14 and 15) with the First Amended Complaint, six months after expiration of the limitations period.

On screening under 28 U.S.C. § 1915A(a), the Court found it unclear whether Plaintiff intended to sue under *Bivens* or under the FTCA and analyzed both situations. *See* Doc. 7 at p. 4.   In his deposition, Plaintiff cleared up what she intended with his original Complaint:  Plaintiff confirmed she knew the difference between a *Bivens* action and an FTCA action.  (SOF 61.)  She confirmed she understands an administrative tort claim is a prerequisite to filing an FTCA lawsuit as opposed to a constitutional claim in which the prerequisite is exhaustion of the BOP administrative remedy procedure. (*Id.*) Knowing the difference, she chose to file a *Bivens* action instead of an FTCA action.  (*Id.*) She did so because, according to Plaintiff, each of the named individual defendants violated his constitutional rights.  (*Id.*)  According to Plaintiff, it was only because the Court rejected the *Bivens* claims that Plaintiff thereafter filed a tort claim against the United States.  (*Id.*)  Having filed that claim two months late, the claim is barred.

### D.    Defendant Is Entitled To Summary Judgment On Liability.

To establish negligence under Arizona law, a plaintiff has the burden of proving (1) a duty owed to the plaintiff, (2) breach of the duty, (3) an injury, and (4) the challenged

act or omission was the cause of the injury.  *Gipson v. Kasey,* 214 Ariz. 141, 143, 150 P.3d 228, 230 (2007).  Plaintiff's factual assertions are (1) she is transgender, (2) she is feminine, (3) she is homosexual, (4) she has been designated to BOP's Sex Offender Management Program, (5) USP Tucson does not have a video recording of how his alleged assailant entered B-2 Unit or how many officers were in the unit, (6) there was one officer on duty instead of two, and (7) she was the victim of an assault.

The only claims in the Second Amended Complaint are failure to monitor an out-of-bounds inmate and failure to have two officers on duty in the housing unit.  Defendant requests that the Court exclude any claims that were not pled, including any claim concerning Plaintiff's placement in the Sex Offender Management Program.  *See Pickern v. Pier 1 Imports, Inc.,* 457 F.3d 963, 968-69 (9th Cir. 2006) (claim raised for the first time in summary judgment briefing is not properly before the district court); *Wasco Prod., Inc. v. Southwall Techs., Inc.,* 435 F.3d 989, 992 (9th Cir. 2006) ("[s]ummary judgment is not a procedural second chance to flesh out inadequate pleadings") (internal quotes and citation omitted); *Stallcop v. Kaiser Found. Hospitals,* 820 F.2d 1044, 1050 n. 5 (9th Cir. 1987) (similar).  Nonetheless, Plaintiff's broad, generalized allegations do not establish a breach of duty or causation in any way.  The evidence establishes the contrary.

1.    There Is No Breach Of Duty**.**

The Sex Offender Management Program is described in Defendant's Statement of Facts, as are the procedures for BOP's designation of inmates to particular facilities and Plaintiff's placement in the Sex Offenders Management Program.  (SOF 14-29). Those facts are not included here due to page limitations.  Defendant refers the Court to the Statement Facts for details concerning those matters.  Plaintiff addresses none of the factors that go into determining an inmate's placement and the analysis that went into determining her placement, among them that she is a sex offender.  (SOF 62.)  Nor does she address that BOP is prohibited placing transgender inmates in dedicated facilities, units or wings solely on the basis of the inmates' status or self-identification.  (SOF 24.) Nonetheless, though Congress has provided that BOP's placement of an inmate is not

1    subject to review (18 U.S.C. § 3621(b)), Defendant's Statement of Facts establishes that

2    Plaintiff's placement was appropriate.  Further, there was no indication of any issues

3    between Plaintiff and his alleged assailant.  Plaintiff never complained of any problems

4    with the other inmate, and there was no assignment of separation between the two at any

5    time leading up to the alleged incident.

6           Nor is there evidence of negligent monitoring.  The officer on duty in B-2 Unit on

7    the morning of May 19, 2016, timely conducted rounds at 8:05 a.m. and a census check

8    at 8:40 a.m., and found no inmate out of place.  The practice for monitoring ingress and

9    egress during open moves was and is to post at the unit entrance and observe inmate

10   behavior, not to check each inmate's ID or otherwise challenge the entry of each and

11   every inmate, both of which would be impossible due to the number of inmates.  In this

12   case, an officer was posted at the entrance monitoring inmate traffic during the open

13   move when Plaintiff's alleged assailant entered the unit.  The inmate entered the unit

14   during an open move between two scheduled accountability checks.  Contrary to the

15   unsupported suggestion in Plaintiff's motion, USP Tucson does have video surveillance

16   in its housing units.  The surveillance cameras cover the majority of the common area of

17   the unit but, like the inmate accountability procedures, video surveillance is not perfect.

18          Nor is there evidence of negligence in having one officer on duty instead of two.

19   The staffing level during the day shift on May 19, 2016, was consistent with the resources

20   allocated for USP Tucson and with the secure and orderly operation of the institution and

21   the unit.  The staffing level did not violate a mandate to have two officers on duty, because

22   there was no such mandate.  As described above, as a result of BOP's request and

23   Congress's approval of additional funding, unit staffing was increased to two officers per

24   unit per shift starting the quarter after Plaintiff's alleged incident.

25          Plaintiff's claim boils down to the allegation that Plaintiff was assaulted.  An assault,

26   without sufficient evidence of breach of duty and causation, does not establish negligence

27   and does not avoid summary judgment in favor of the defendant.  *See Gipson,* 214 Ariz.

28   at 143, 150 P.3d at 230 (listing elements); *Martin v. Royal Sign Co. Inc.,* No. 1CA-CV-14-

1  0743, 2016WL2657308 (App. May 10, 2016) (affirming summary judgment or defendant).

2  ## 2.   There Is No Causation.

3  Causation has two parts, both of which must be established for causation to exist.

4  *Boisson v. Ariz. Bd. of Regents,* 236 Ariz. 619, 622, 343 P.2d 931, 934 (App. 2015).  First,

5  the plaintiff must prove cause-in-fact (*id.*), which means that the act or omission was a

6  "substantial factor" in producing the injury and the injury would not have occurred "but for"

7  the act or omission.  *Ontiveros v. Borak,* 136 Ariz. 500, 505, 667 P.2d 200, 205 (1983).

8  Second, the plaintiff must prove proximate cause (*id.*), which means that the "scope of

9  liability" extends to the risk of the harm suffered (*Salt River Valley Water Users Ass'n v.

10  Cornum,* 49 Ariz. 1, 63 P.2d 639 (1937)) or, in other words, that an unreasonable risk of

11  the plaintiff's injury was a foreseeable result of the act or omission (*Rogers v. Retrum,*

12  170 Ariz. 399, 825 P.2d 20 (App. 1992)).  To avoid summary judgment, the plaintiff must

13  provide evidence from which a reasonable jury could find that the act more likely than not

14  caused the injury. *Kreisman v. Thomas,* 12 Ariz. App. 215, 217, 469 P.2d 107, 109 (1970).

15  Plaintiff provides no evidence of causation.    Instead, the evidence shows a lack

16  of causation.  The cause of plaintiff's harm was not the presence of the alleged assailant

17  in Plaintiff's housing unit.  First, there was nothing preventing the two inmates from being

18  assigned to the same unit.  There were no indications of trouble between the two inmates

19  prior to the alleged incident, and no assignment of separation between them.  Plaintiff

20  had never complained of any problems with the inmate, or any issue with Plaintiff's risk

21  assessment.  The two could have been assigned to the same housing unit.  Second, the

22  two inmates had many opportunities to come in contact with one another outside of B-2

23  unit.  Indeed, according to Plaintiff, the two did come in contact with one another on other

24  occasions.  Third, the presence of a second officer on duty would not have prevented the

25  inmate from entering B-2 Unit.  The procedure was to have one officer posted at the

26  entrance monitoring the ingress and egress during open moves, as occurred here, but

27  without any requirement or practicable ability to challenge the entry or check the

28  identification of each and every inmate.  The inmate entered during an open move

1    between two accountability checks.  Nor would having a second officer on duty have
2    prevented the alleged incident.  The door to the cell was closed, obscuring a view to the
3    interior except by peering into the cell through the small window, which was not called for
4    during the relevant time.  Fourth, the rule against being out of bounds is not directed
5    toward preventing the type of harm alleged.  Other more specific measures are in place
6    to prevent assaults. Despite reasonable measures to prevent inmates from being out of
7    bounds, inmates can and do go out of bounds for a number of reasons having nothing to
8    do with an assault.  Plaintiff's injuries would not have occurred "but for" the alleged acts
9    or omissions, and were not a foreseeable risk of the alleged acts or omissions.

10        In all events, "[n]ot every foreseeable risk is an unreasonable risk."  *Rogers*, 170
11   Ariz. at 402, 825 P.2d at 23.  "It does not suffice to establish liability to prove (a) that
12   defendant owed plaintiff a duty of reasonable care; (b) that an act or omission of
13   defendant was a contributing cause of injury to plaintiff; and (c) that the risk of injury
14   should have been foreseeable to defendant."  *Id.*  Assuming Plaintiff's allegations to be
15   true, the cause of Plaintiff's harm was the inmate's assault upon Plaintiff.  *See id.* (finding
16   no causation as a matter of law where school's unsupervised ingress and egress of
17   students did not create an unreasonable risk of an auto accident).

18   **IV.    PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT.**

19        Plaintiff does not move for summary judgment concerning a failure to prevent the
20   inmate from entering B-2 unit.  His motion relates to video monitoring, not having two
21   officers on duty and a failure to protect based on Plaintiff's appearance, which is not pled
22   and, as noted above, should not be considered.  Assuming the Court does not dismiss
23   this action for lack of jurisdiction or on the other legal grounds discussed, the Court should
24   deny Plaintiff's motion.  Plaintiff has not established an entitlement to summary judgment
25   in any respect.   His factual assertions are nonspecific, conclusory and, in parts,
26   unsupported and speculative.  His "facts" do not establish the elements of his negligence
27   claims, and the authorities she relies on are *Bivens* actions, not FTCA negligence claims.
28        Additionally, the crux of Plaintiff's claim – that she was assaulted – is disputed.

1   The alleged assailant denies the allegations, the relevant witnesses do not corroborate
2   the allegations, and BOP determined the allegations were unsubstantiated.   Further,
3   Plaintiff has a history of false statements including accusations of sexual harassment.
4   For example, on or about February 28, 2013, she sent a written notice to BOP staff that
5   another inmate – not the one accused in this action – had been harassing and threatening
6   Plaintiff for sex.  (SOF 66.)  After a hearing, Plaintiff was found guilty of making a false
7   statement to BOP officials.  (*Id.*)  Plaintiff admitted the allegation was false and at different
8   times gave different explanations:  that the inmate was going to disclose the nature of
9   their relationship, that the inmate had led Plaintiff on and was refusing to be Plaintiff's
10  friend, and that Plaintiff was told to make the allegation by someone Plaintiff saw in a
11  hallucination.  (*Id.*)  On or about May 27, 2017, Plaintiff received an incident report for
12  engaging in sexual acts with another inmate.  (SOF 67.)  In response, Plaintiff stated for
13  the first time that the other inmate had been harassing him and threatening him for sex.
14  (*Id.*)  In the hearing, it was noted that Plaintiff had sent a message to certain inmates she
15  intended to call as witnesses coaching them about the alleged harassment.  (*Id.*)  Plaintiff
16  has received a psychological assessment of being untruthful and avoiding taking
17  responsibility for her actions.  (SOF 68.)  Whether any assault or incident occurred at all
18  – key to his case – is an issue for trial.[5]

19  **V.    CONCLUSION.**

20          For the foregoing reasons, Defendant requests that Plaintiff's Motion for Summary
21  Judgment be denied and that summary judgment be entered in Defendant's favor.

22          RESPECTFULLY SUBMITTED this 20th day of May, 2019.

23                                      MICHAEL BAILEY
                                        United States Attorney
24                                      District of Arizona

25                                      */s/ Michael A. Ambri*
                                        MICHAEL A. AMBRI
26                                      Assistant U.S. Attorney

27  _____

28  [5]  This fact issue does not prevent summary judgment in Defendant's favor.  Defendant's
    motion does not depend on a finding that the incident did not occur.

1

2

Served by first class U.S. mail this 21st day of May, 2019, upon:

3

Edward J. Gladney
No. 80179-279

4

USP Coleman II
P.O. Box 1034

5

Coleman, Florida  33521

6

*/s/ Pamela Vavra*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28